WILDEARTH GUARDIANS,
et al., Plaintiffs,

v.

Heather PROVENCIO,
et al., Defendants.

No. CV–16–08010–PCT–SMM

United States District Court,
D. Arizona.

Signed 09/26/2017

Cynthia Christine Tuell, Attorney at Law, Tucson, AZ, John R. Mellgren, Eugene, OR, Susan Jane M. Brown, Portland, OR, for Plaintiffs.

Paul David Barker, Jr., Stacey M. Bosshardt, Taylor Nicholson Ferrell, U.S. Dept. of Justice, Washington, DC, for Defendants.

## AMENDED ORDER

Honorable Stephen M. McNamee, Senior United States District Judge

Pending before the Court is Plaintiffs WildEarth Guardians, Grand Canyon Wildlands Council, Wildlands Network, and Sierra Club's (collectively, "Plaintiffs") motion for summary judgment and memorandum of points and authorities in support. (Docs. 44–45.) Plaintiffs filed a statement of facts and declarations in support of their motion. (Docs. 46–48.) Federal Defendants Heather Provencio and United States Forest Service (collectively, "Defendants") filed a cross-motion for summary judgment and a response in opposition to Plaintiffs' motion, and a statement of facts in support. (Docs. 49–51.) Plaintiffs filed a reply to Defendants' cross motion and response (Docs. 65, 66), to which Defendants filed a reply (Doc. 72).

Also pending before the Court is Intervenor–Defendant Safari Club International's cross-motion for summary judgment (Doc. 52–53) and Intervenor–Defendant State of Arizona's cross-motion for partial-summary judgment (Doc. 55). Intervenor Defendants filed statements of facts in support of their motions. (Docs. 54, 56–57.) Plaintiffs filed one response in opposition to Intervenor–Defendants' motions (Doc. 70), to which Intervenor–Defendants filed separate replies (Docs. 74, 75). The Court also granted Rocky Mountain Elk Foundation leave to file an Amicus Curiae Brief in support of Defendants. (Doc. 80.)

The matter being fully briefed, the Court now issues the following ruling.[1]

## I. BACKGROUND [2]

### A. The Kaibab National Forest

The Kaibab National Forest ("KNF") is located in northern Arizona and consists of three ranger districts: the North Kaibab Ranger District ("NKRD"), the Tusayan Ranger District ("TRD"), and the Williams Ranger District ("WRD").

The NKRD encompasses approximately 655,078 acres in Coconino and Mohave Counties in North Central Arizona and is bounded on the south by the North Rim of the Grand Canyon National Park and on the remaining sides by Bureau of Land Management areas. (AR 13949.) The TRD encompasses 331,427 acres of National Forest and is located just south of the

---

1. The parties' request for oral argument is denied because the parties have had an adequate opportunity to present their written arguments, and oral argument will not aid the Court's decision. See Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev., 933 F.2d 724, 729 (9th Cir. 1991).

2. The Administrative Record in this case consists of more than 41,000 pages. Citations to the Administrative Record are noted as "AR" followed by the applicable Bates number. Citations to the Supplemental Administrative Record are noted as "S" followed by the applicable Bates number.

South Rim of Grand Canyon National Park. (AR 26021.) The TRD borders the Navajo Indian Reservation to the east, and the Havasupai Indian Reservation and Arizona State and private land to the west and south. (Id.) The TRD is not contiguous with other National Forest System lands. (Id.) The WRD encompasses 560,305 acres of National Forest and surrounds the town of Williams, approximately 35 miles west of the city of Flagstaff and approximately 60 miles south of Grand Canyon National Park. (AR 40831.) The WRD lies predominantly in Coconino County; however, a small section of the district is located in Yavapai County on the west side. (Id.) The WRD is bordered by the Coconino National Forest to the east and southeast, State and Private lands on the north and west sides, and the Prescott National Forest on the south and southwest sides. (Id.)

All three ranger districts provide opportunities for recreational activities, including hiking, hunting, and camping. (AR 13973–13974; 26054–26055; 40861–40864.) The ranger districts are also home to a number of plant and animal species, including some threatened and endangered species. (AR 14009–14031; 26128–26158; 26098–26115; 40903–40923; 40933–40960.) The ranger districts are also home to numerous cultural resources. On the NKRD, for example, heritage or cultural resources include remains of "limited activity sites such as hunting and gathering camps, prehistoric agricultural areas, rock art, and historic resource extraction areas; habitation sites including pueblos, prehistoric residential camps, and historic cabins; linear features like roads, trails, and fences; and special use sites including traditional cultural properties of significance to area tribes." (AR 14032.) On the TRD, archaeologists have identified 1,770 cultural resources, recorded 379 sites with above ground masonry architecture, and documented 259 historic period sites that in-clude cabins, mines, mining camps, railroad grades and camps, line shacks, water storage features, an airport hangar, sweat lodges, hogans, and pinyon nut gathering camps. (AR 26158.) Cultural resources on the WRD include "prehistoric artifacts scatters, ancestral puebloan sites with masonry structures, prehistoric agricultural areas, cultural sensitive sites such as Traditional Cultural Places, historic cabins, logging railroad grades and camps, Civilian Conservation Corp camps..., [and] historic Forest Service administration buildings." (AR 40960.)

**B. The Travel Management Projects**

The NKRD, TRD, and WRD undertook projects to designate a system of roads on each ranger district. (AR 13952, 26023, 40835.) The goal of each project was to improve the management of motorized vehicle use on each ranger district in accordance with the 2005 Travel Management Rule (discussed *infra*). (AR 13947, 26020, 40830.) These travel management projects resulted in the publication of Motor Vehicle Use Maps showing those roads designated for motor vehicle use. (Id.) Motor vehicle use off the designated road system is prohibited unless authorized by permit, permitted by local decision, or allowed by the Travel Management Rule. (Id.)

Each ranger district developed an Environmental Assessment presenting the results of the analysis of the direct, indirect, and cumulative environmental effects of the proposed action and alternatives to the proposed action (discussed *infra*). (AR 13942, 26041; 40823.) The decisions implementing the chosen actions for each ranger district were documented in Decision Notices signed by the Kaibab National Forest Supervisor and Findings of No Significant Impacts. (AR 14236, 25876, 41266.)

### C. National Historic Preservation Act Obligations

The Forest Service's National Historic Preservation Act obligations for each ranger district's travel management decisions are guided by the First Amended Programmatic Agreement Regarding Historic Property Protection and Responsibilities between Region 3 of the Forest Service, the Advisory Council on Historic Preservation, and the States of Arizona, New Mexico, Texas, and Oklahoma. (S00233–322). Pursuant to the Programmatic Agreement, the parties developed the Standard Consultation Protocol for Travel Management Route Designation, found in Appendix I to the Agreement. (S00300–08.) The Protocol outlines the process for compliance with Section 106 of the NHPA for travel management, listing the activities for which further Section 106 is required, and those activities which are exempt. (S00301–02.) The NHPA, the Programmatic Agreement, and the Protocol are described in greater detail *infra*.

### D. The Present Action

Plaintiffs commenced this action in January 2016 alleging violations of the National Environmental Policy Act ("NEPA"); Executive Order 11644, as amended by Executive Order 11989; the National Historic Preservation Act ("NHPA"); and certain "implementing regulations established pursuant to these federal statutes and executive orders," including the Travel Management Rule ("TMR"). (Doc. 1 at ¶ 1.) Defendants are Heather Provencio, Forest Supervisor for the Kaibab National Forest, and the United States Forest Service ("Forest Service"). (Id. at ¶ 13–14.)

Plaintiff WildEarth Guardians is a nonprofit conservation organization that "works[s] to protect the natural and cultural features of landscapes within national forests and other public lands, including

their wildlife and historic properties." (Id. at ¶ 6.) Plaintiff Grand Canyon Wildlands Council is a nonprofit conservation organization whose mission is to "create and apply a dynamic conservation area network that ensures the existence, health, and sustainability of all native species and natural ecosystems in the Grand Canyon ecoregion." (Id. at ¶ 7.) Plaintiff Wildlands Network is a nonprofit conservation organization that "reconnects wildlife habitats in North America so that animals can live in and move safely through the landscape," "collaborates with partner groups to create wildlife corridors at a large enough scale to meet the needs of wolves, mountain lions, and other native carnivores," and "engages with federal agency staff, and federal and state policymakers to ensure that . . . public lands are appropriately managed and . . . laws and public policies are effectively and correctly implemented and enforced to protect conservation values." (Id. at ¶ 8.) Plaintiff Sierra Club is a nonprofit grassroots organization whose mission is to "explore, enjoy, and protect the wild places of the Earth, to practice and promote responsible uses of the Earth's ecosystems and resources, to educate and enlist humanity in the protection and restoration of the quality of the natural and human environment, and to use all lawful means to carry out those objectives." (Id. at ¶ 9.)

## II. LEGAL STANDARD

### Administrative Procedure Act

 Plaintiffs' claims are brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2012). (Doc. 1 at ¶¶ 1–3.) Under the APA, a reviewing court may overturn a final agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Great Old Broads for Wilderness v. Kimbell, 709 F.3d 836, 846 (9th Cir. 2013) (quoting City of Sausalito v. O'Neill, 386 F.3d 1186, 1206 (9th Cir. 2004)). This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotations and further citation omitted); see also O'Neill, 386 F.3d at 1206 ("[A reviewing court] must uphold agency decisions so long as the agenc[y] ha[s] considered the relevant factors and articulated a rational connection between the factors found and the choices made.") (internal quotations and further citation omitted). The APA does not allow a court to overturn an agency action simply because the court disagrees with the action. See River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010).

 Summary judgment is an appropriate vehicle for resolving challenges to agency action under the APA. See Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture, 18 F.3d 1468, 1471–72 (9th Cir. 1994). And, where a case involves review of a final agency determination under the APA, resolution of the matter does not require fact finding by the reviewing court because the parties stipulate to the administrative record. Id.

## III. DISCUSSION

Plaintiffs move for summary judgment on the grounds that the Forest Service violated the Travel Management Rule, the National Environmental Policy Act, and the National Historic Preservation Act. (Doc. 45 at 6, 15, 45.)

### TRAVEL MANAGEMENT RULE

In 2005, the Department of Agriculture revised its regulations regarding travel management on National Forest System lands in order to "clarify policy related to motor vehicle use, including the use of off-highway vehicles." Travel Management; Designated Routes and Areas for Motor Vehicle Use, 70 Fed. Reg. 68264–01, 2005 WL 2986693 (Nov. 9, 2005) (codified at 36 C.F.R. §§ 212, 251, 261, 295). The TMR "prohibit[s] the use of motor vehicles off the designated system, as well as use of motor vehicles on routes and in areas . . . not consistent with the designations." Id. Importantly, the rule is consistent with Executive Orders 11644 and 11989, which direct federal agencies to ensure that "the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." Id.

Motor vehicle use on a National Forest System road, on a National Forest System trail, and in an area on National Forest System land is prohibited unless that road, trail, or area is specifically designated for motor vehicle use. 36 C.F.R. § 212.51(a); § 261.13. Exempt from this prohibition are certain vehicles and uses, such as limited administrative use by the Forest Service, law enforcement responses to violations of law, and the authorized use of any combat or combat support vehicle for national defense purposes. § 212.51(a)(4),(6)–(7). A notable exception to the general prohibi-

tion—and at issue here—is the motorized big game retrieval ("MBGR") exception. § 212.51(b).

The MBGR exception provides that "the responsible official may include in the designation [of routes] the limited use of motor vehicles within a specified distance of certain forest roads or trails where motor vehicle use is allowed, and if appropriate within specified time periods" for the purpose of retrieving a downed big game animal. Id. Although "route" is not defined in § 212.1, Definitions, it appears in the definition of "road" and in the definition of "trail":

> **Road.** A motor vehicle *route* over 50 inches wide, unless identified and managed as a trail.

> **Trail.** A *route* 50 inches or less in width or a *route* over 50 inches wide that is identified and managed as a trail.

§ 212.1 (emphasis added). Based on the plain language of these definitions, it is clear that the MBGR exception applies following the designation of roads or trails (i.e., routes) for motor vehicle use. The use of "roads or trails" following the use of "routes" in the MBGR exception lends further support to this conclusion.

The TMR contains general and specific criteria for the Forest Service to consider when designating trails, areas, and roads for motor vehicle use. § 212.55 (a)-(c). The general criteria apply to trails, areas, and roads, and require that

> the responsible official shall consider effects on National Forest System natural and cultural resources, public safety, provision of recreational opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability of re-

sources for that maintenance and administration.

§ 212.55(a). The specific criteria apply to trails and areas, and roads, respectively. § 212.55(b)-(c). When designating trails or areas, the responsible official must consider effects on, with the objective of minimizing, a number of things, such as damage to soil, harassment of wildlife, and significant disruption of wildlife habitats. See 36 C.F.R. 212.55(b)(1)-(5). When designating roads, the responsible official must consider "[s]peed, volume, composition, and distribution of traffic on roads," and "[c]ompatibility of vehicle class with road geometry and road surfacing." §§ 212.55 (c)(1)-(2).

Plaintiffs raise two TMR arguments. First, Plaintiffs argue that the Forest Service violated the TMR because it failed to "limit and sparingly apply" the MBGR exception by allowing "extensive" cross-country off-road motorized vehicle use for the purpose of big game retrieval, and second, that the Forest Service violated the TMR by failing to consider, or failing to sufficiently consider, the minimization criteria set forth in § 212.55(b). (Doc. 45 at 8, 11.) The Court will examine these arguments in reverse order.

## A. 36 C.F.R. § 212.55(b) Minimization Criteria

Plaintiffs allege that the Forest Service violated the TMR by failing to consider, or failing to sufficiently consider, the minimization criteria set forth in § 212.55(b). (Doc. 45 at 11–12.) Section 212.55(b) lists the specific criteria which a responsible official must consider when designating trails or areas for motor vehicle use, such as damage to soil, harassment of wildlife, and significant disruption of wildlife. § 212.55(b)(1)-(5).

Plaintiffs assert that the Forest Service was obligated to consider the minimization

criteria since it designated areas for MBGR on each ranger district (Doc. 45 at 14), but did not, and admits so, because it claims to have designated roads, not areas on the TRD and NKRD (id. at 11, citing AR 26330, AR 14829). In support of their assertion that the Forest Service designated areas and therefore was obligated to consider the minimization criteria, Plaintiffs point to the maps of the TRD and NKRD, and argue that the places where MBGR is authorized on each ranger district map constitute "areas" (id. at 14, citing AR 25901, 41253) and the fact that the Forest Service referred to locations on the Forest where MBGR is authorized as "areas" (id. at 14, citing AR 26034, 13960, 3704). Plaintiffs further assert that the Forest Service "maintained that it complied" with the minimization criteria for the WRD (id. at 12, citing AR 41091, 41436–37, 40838), but did not provide an adequate explanation as to how it do so, instead offering only "conclusory statements that impacts to resources are minimized and that mitigation measures will minimize impacts" (id., citing AR 40856, 40898–99, 40969, 40986).

As a preliminary matter, the Court finds that the Forest Service has not "maintained that it complied" with the minimization criteria of § 212.55(b) for the WRD. Plaintiffs' citations to the record in support of the assertion do not, in fact, support it. First, the quotation taken from AR 41091 is taken out of context. When quoted in full:

> The Forest Service disagrees because by completing the EA and reviewing the project record the responsible official has complied with all of 36 CFR part 212.55 and Executive Order 11664. The minimum road system for the WRD was identified in the TAP (2010), and the recommendations were incorporated and analyzed in the EA under Alternatives 2 & 3. Additional alternatives were consid-

ered but eliminated from detailed study that would close and provide a substantially reduced road system (Section 2.7). The environmental consequences of implementing Alt. 1–4 are disclosed in Chapter 3 of the EA.

(AR 41091.) The repeated mentions of "road system" indicate that the Forest Service was likely referring to compliance with § 212.55(c), not § 212.55(b). Moreover, the statement that the responsible official has "complied with *all* of 36 CFR part 212.55" necessarily means that he complied with either § 212.55(a) and (b), *or* § 212.55(a) and (c)—depending on whether he designated trails or areas, or roads.

Neither does the quotation taken from AR 40838 support the assertion that Forest Service "maintained that it complied" with the criteria set forth in § 212.55(b). The quote is also taken out of context. The quote appears under the heading "Motorized Trails and Areas" and under the subheading "Desired Condition." The "Desired Condition" sub-heading focuses on *trails*. Thus, the statement that the transportation system is "within the District's ability to manage (operate and maintain) and provides a variety of users with a safe and diverse experience while minimizing resource impacts (36 C.F.R. § 212.55(b))" is consistent with the regulation requiring the Forest Service to consider the minimization criteria if it designates trails (or areas). (AR 40837–38.)

Finally, the quotation from AR 41436–37 is an excerpt from the Forest Service's response to the contention that "none of the alternatives comply" with § 212.55(a) or (b). Although the response to the contention lists the minimization criteria of § 212.55(b) and then cites the WRD's Environmental Assessment ("EA"), Decision Notice ("DN") and Finding of No Signifi-

cant Impact ("FONSI") in support of its ultimate finding (that "the project meets the requirements of TMR for consideration of effects on natural and cultural resources, soils, watersheds, vegetation, wildlife and habitat"), nowhere in the DN or FONSI is § 212.55(b) mentioned, much less its minimization criteria explicitly considered. In the EA, § 212.55(b) is discussed as detailed in the preceding paragraph (AR 40837–38). For these reasons, the Court finds that the Forest Service has not "maintained" to have complied with the criteria of § 212.55(b).

The Court now turns to Plaintiffs' charge that the Forest Service violated the TMR by failing to consider the minimization criteria of § 212.55(b).

■ Plaintiffs summarily argue that the Forest Service designated *areas* for MBGR on each ranger district and therefore was required to apply the minimization criteria of § 212.55(b). (Doc. 45 at 11–14.) The Forest Service urges the Court to reject Plaintiffs' argument that the ranger districts' authorization of MBGR constitutes a "*de facto* designation of a discrete 'area' that falls within the definition of 'area' in the TMR..." (Doc. 49–1 at 28.) The Forest Service argues that the regulations do not treat MBGR as designation of an area, but rather "as a narrow exception to the closure of the administrative unit to motor vehicle use..." (Doc. 49–1 at 28.) In support, the Forest Service cites the preamble to the Forest Service's final rule, which provides: "[o]n some units, it may be possible to administer motor vehicle use associated with dispersed camping or big game retrieval through a permit system, *rather than as a component of a designation*" (id. at 28, citing 70 Fed. Reg. at 68285) and the Forest Service Manual, which states that "[m]otor vehicle use in an *area* may not be restricted by type of activity, only by vehicle class and, if appro-

priate time of year" (id. at 29, citing AR 4525–26). As to the latter citation, the Forest Service notes that MBGR on each ranger district is restricted to a specific activity—retrieval of a particular animal. (Id. at 30.)

The Court agrees with the Forest Service's characterization of MBGR as a "component of a designation" and finds that MBGR is a component of *trail* and *road*—not *area*—designations. As explained *supra*, the plain language of the MBGR exception makes clear that where the responsible official designates *roads* or *trails* (i.e., routes) for motor vehicle use, he or she may then apply the MBGR exception. Accordingly, Plaintiffs' argument—that the Forest Service designated *areas* for MBGR on each ranger district and therefore was required to apply the minimization criteria of § 212.55(b)—simply fails.

The Court thus rejects Plaintiffs' argument that the Forest Service violated the TMR by failing to apply the minimization criteria of § 212.55(b).

## B. Motorized Big Game Retrieval Exception: 36 C.F.R. § 212.51(b)

■ Plaintiffs also allege that the Forest Service violated the TMR because it failed to "limit and sparingly apply" the MBGR exception by allowing "extensive" cross-country off-road motorized vehicle use for the purpose of big game retrieval. (Doc. 45 at 8–9, citing AR 25878, AR 14241, AR 41268). In response, the Forest Service contends that the AR "demonstrates that the one-mile MBGR exceptions on the[ ] three districts allow for limited exceptions to the general prohibition on cross-country motor vehicle use" and that the Forest Service gave "careful consideration to limiting the exception in order to allow reasonable opportunity to retrieve downed big game animals, while

minimizing the level of use and potential effects" and that as such, the MBGR exceptions are "comfortably within the Forest Service's authority under the TMR." (Doc. 49–1 at 21.) The Court agrees.

As stated *supra*, the MBGR exception provides that "the responsible official may include in the designation [of routes] the *limited use* of motor vehicles within a specified distance of *certain* forest roads or trails where motor vehicle use is allowed, and if appropriate within specified time periods" for the purpose of retrieving a downed big game animal. § 212.51(b). For the following reasons, the Court finds that the Forest Service has adhered to the directives of § 212.51(b).

First, the Forest System has imposed a number of limitations on the use of motor vehicles in each of the ranger districts for the purpose of retrieving a downed big game animal. For example, on the NKRD, MBGR is limited in the following ways: (1) only legally harvested bison or elk may be retrieved; (2) MBGR of legally harvested bison or elk is only allowed during seasons designated by the Arizona Game and Fish Department ("AZGFD"), and for 24 hours following each season; (3) only one vehicle (one trip in and one trip out) is allowed for MBGR per harvested animal; (4) hunters are required to use the most direct and least ground disturbing route in and out of the area to accomplish the retrieval; (5) MBGR is not allowed in any existing off-road travel restricted area, or when conditions are such that travel would cause negative resource impacts. (AR 14241.) Notably, these limitations are a significant departure from the previous policy which did not limit the number of trips for MBGR, did not limit the type of species which could be retrieved by motor vehicle, did not limit the distance traveled from system roads, and had no restrictions on seasons or weather conditions and no re-

quirement for use of a direct route. (AR 14248.)

Similar to the NKRD, the TRD and WRD impose the following limitations on MBGR: (1) only legally harvested elk may be retrieved; (2) MBGR of legally harvested elk is only allowed during seasons designated by the AZGFD, and for 24 hours following each season; (3) only one vehicle (one trip in and one trip out) is allowed for MBGR per harvested animal; (4) hunters are required to use the most direct and least ground disturbing route in and out of the area to accomplish the retrieval; (5) MBGR is not allowed in any existing off-road travel restricted area, or when conditions are such that travel would cause negative resource impacts; and (6) motorized vehicles would not be permitted to cross riparian areas, streams and rivers except at hardened crossings or crossings with existing culverts. (AR 25878, 41269.) On the TRD, these limitations were a significant departure from the previous policy which did not limit the number of trips for MBGR, did not limit the type of species which could be retrieved by motor vehicle, did not limit the distance traveled from system roads, and had no restrictions on seasons or weather conditions and no requirement for use of a direct route. (AR 25884.)

Not only has the Forest Service placed limitations on the use of motor vehicles in each ranger district, but it has also applied mitigation measures to "ensure environmental effects remain at acceptable levels." (AR 14243, 25879). Mitigation measures on the NKRD include: (1) prohibiting MBGR when it results in damage to natural and cultural resources and/or compromises the ability of the Forest Service to meet management objectives; and (2) providing motor vehicle operators information and ethics guidance at portals located at main access points on the District, on the

Motor Vehicle Use Maps, and in printed materials developed about travel management on the KNF. (AR 14243.) Among the mitigation measures on the TRD and WRD are: (1) prohibiting the use of motor vehicles, including for the purpose of retrieving a legally taken elk, when it results in damage to natural and cultural resources and/or compromises the ability of the Forest Service to meet management objectives; and (2) implementing the Wet Weather Roads Policy when soil moisture conditions and the potential for road and resource damage exist. (AR 25879, 41270.)

In addition to these limitations and mitigation measures, the Forest Service monitors those areas where MBGR is authorized "to assess for damage to natural and cultural resources and/or frequently occurring actions that compromise the ability of the Forest Service to meet management objectives." (AR 14243, 25880, 41270.) If damage to soil or vegetation is discovered, the Forest Service "will take the necessary action" to move the areas/corridors into compliance with the Forest Plan, which may include temporary or permanent closure to motorized vehicle use. (Id.)

The Court finds that the aforementioned limitations on MBGR, the mitigation measures to contain the environmental effects on MBGR, and the monitoring of MBGR demonstrate that the Forest Service has authorized the *limited* use of motor vehicles for the purpose of retrieving downed big game animals on the NKRD, TRD, and WRD.

Moreover, the record supports the Forest Service's decision to authorize MBGR on the three ranger districts. (AR 13942, 26014, 40822.) Each Environmental Assessment shows that off-road motor vehicle use for up to one mile off of every open NKRD, TRD, or WRD road would have no significant impact on ranger district resources.

For example, big game harvest data published by the AZGFD led the Forest Service to reasonably conclude that corresponding levels of cross-country motor vehicle use would have no significant impact on the NKRD's resources. (AR 13986, 13988–89, 14036, 14020.) In 2009, the estimated number of bison retrieved by motor vehicle was 34, and the estimated number of elk retrieved by motor vehicle was zero. (AR 13956). The selected alternative allows for MBGR of bison and elk only, and does not allow for the MBGR of mule deer on the NKRD because mule deer is a far more popular game species on the NKRD—in 2009, it was estimated that 918 mule deer were harvested by motor vehicle. (AR 13956.) Thus, the relatively small number of motor vehicle retrievals of bison and elk, combined with the aforementioned limitations, mitigation measures, and monitoring by the Forest Service, support the Forest Service's decision to authorize MBGR for bison and elk retrieval on the NKRD and show that it was neither arbitrary nor capricious.

On the TRD and WRD, a seemingly large number of elk is expected to be retrieved by motor vehicle on an annual basis (414 in the TRD, 695 in the WRD). (AR 26026, 40840). However, a very small percentage of each district is expected to be actually impacted by MBGR (0.06% of the TRD, or 200 acres, and 0.625% of the WRD, or 350 acres), and currently, most motorized big game retrievals in the TRD and WRD use one trip with a vehicle and leave "very little or no evidence" that the trip occurred. (AR 26160, 26026, 40962, 40839). These facts, combined with the aforementioned limitations, mitigation measures, and monitoring by the Forest Service, support the Forest Service's decision to authorize MBGR of elk on the TRD and WRD and show that the decision was neither arbitrary nor capricious.

In the end, Plaintiffs have only identified dissatisfaction with the ultimate decisions made by the Forest Service in authorizing MBGR in the three ranger districts. Indeed, their argument consists of statements without any basis in law or fact, such as the "nearly unlimited spatial allowance for [MBGR], in and of itself, violates the [TMR]," and "the amount and extent of anticipated effects from [MBGR] is irrelevant for determining whether...the Forest Service complied with the TMR..." (Doc. 65 at 6.)

A reviewing court "must uphold agency decisions so long as the agenc[y] ha[s] considered the relevant factors and articulated a rational connection between the factors found and the choices made." O'Neill, 386 F.3d at 1206 (internal quotations and further citation omitted). This the Forest Service has done. Accordingly, the Court will uphold the Forest Service's decision to allow for the limited use of motor vehicles within one mile of all designated system roads (except where prohibited) in the NKRD, WRD, and TRD in order to retrieve a downed big game animal, and will grant summary judgment in favor of the Forest Service on the TMR claim.

## NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is a "procedural statute that requires the Federal agencies to assess the environmental consequences of their actions before those actions are undertaken." Klamath–Siskiyou Wildlands Center v. Bureau of Land Management, 387 F.3d 989, 993 (9th Cir. 2004). Under NEPA, federal agencies must prepare a "detailed statement" of environmental consequences for "major Federal actions significantly affecting the quality of the human environment" 42 U.S.C. § 4332(C). A "detailed state-ment" is known as an environmental impact statement ("EIS").

The EIS requirement serves two important purposes. First, "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Second, "it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." Id.

A federal agency may prepare an Environmental Assessment ("EA") to decide whether the environmental impact of a proposed action warrants preparation of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." § 1508.9(a). An EA must include "brief discussions ...of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." § 1508.9(b). If an agency determines that an EIS is not required, it must issue a FONSI, briefly describing why the action "will not have a significant effect on the human environment ..." § 1508.13.

In reviewing an agency decision not to prepare an EIS, a court inquires whether the "responsible agency has reasonably concluded that the project will have no significant adverse environmental consequences." Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir. 1988) (quoting San Francisco v. United States, 615 F.2d 498, 500 (9th Cir. 1980). "If substantial questions are raised regarding whether the proposed action

*may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." Save the Yaak, 840 F.2d at 717 (further citation omitted) (emphasis in original). In addition, "an agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons of why potential effects are insignificant." Id. (internal quotations and further citation omitted). To be certain, "the statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." Id.

Plaintiffs raise two NEPA arguments. First, Plaintiffs contend that the Forest Service violated the NEPA by failing to take a "hard look" at "several categories of environmental effects." (Doc. 45 at 19.) Second, Plaintiffs contend that the Forest Service violated the NEPA by declining to prepare an EIS for each travel management plan "despite the presence of several significance factors indicating possible significant environmental consequences of the proposed actions." (Id. at 33.)

## A. Whether the Forest Service Took a "Hard Look"

 Plaintiffs argue that the Forest Service failed to take a "hard look" at the effects of: MBGR on each ranger district; closing routes on each ranger district; and past, present, and future motorized use on each ranger district. (Doc. 45 at 19.) The Court will address each argument in turn.

### 1. Effects of MBGR

Plaintiffs argue the Forest Service failed to analyze, or failed to adequately analyze, the effects of MBGR with regard to wet conditions, erodible soils, invasive weeds, tire tracks, animal habitat, and hunter noncompliance. (Doc. 45 at 19–23.) For the following reasons, the Court rejects the argument.

Regarding wet conditions, Plaintiffs dispute the Forest Service's conclusion that MBGR "will result in short term negative effects to some recreation settings on just a few hundred acres per district per year" and contend that each ranger district's EA and DN/FONSI "*ignore*[ ] the fact that nearly the entire forest is going to be open to motorized cross-country travel, placing far more than a few hundred acres at risk for continued damage each year." (Id. at 20 (emphasis added).)

The record does not support Plaintiffs' contention. First, it is an exaggeration to say the "entire forest is going to be open to motorized cross-country travel" when each ranger district's proposed action prohibits unrestricted cross-country motor vehicle use, with the exception of dispersed camping and MBGR (AR 26063–65, 13985, 40880–82), and limits MBGR to certain seasons (AR 14241, 25878, 41269). Second, the EAs make clear that MBGR, on an annual basis, is anticipated to impact only .0099% of the acreage on the NKRD, 0.06% of the TRD, and 0.0625% of the WRD. (AR 14042–43, 26160, 40962.) The EAs provide the methodology behind these estimates. (Id.; 40 C.F.R. § 1502.24 (requiring that agencies "identify any methodologies used" and "make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement").) The estimates are based on the actual number of big game harvests retrieved on an annual basis, multiplied by estimated tire width, then multiplied by the maximum number of miles (two) a hunter may travel to retrieve a downed big game animal, and then again multiplied by the number of tire tracks created (two). (AR 14042–43, 26160, 40962.) Plaintiffs present no compelling argument or evidence that this methodology violates the

NEPA. Third, each ranger district's proposed action provides options for the Forest Service in the event of wet conditions. For example, under the TRD and WRD's proposed actions, the Forest Service may implement the Wet Weather Roads Policy when soil moisture conditions and the potential for road and resource damage exist. (AR 25879, 41270.) And, in all of the ranger districts, the Forest Service monitors those areas where MBGR is authorized, and may temporarily or permanently close roads if damage is discovered. (AR 14243, 25880, 41270.)

Based on the foregoing, the Court has no reason to find that the Forest Service "ignored" the effects of MBGR with regard to wet conditions. To the contrary, the Court finds that the Forest Service adequately analyzed the effects of MBGR with regard to wet conditions and provided convincing reasons why the potential effects of MBGR on wet conditions would be insignificant.

Regarding erodible soils, Plaintiffs argue the NKRD EA is insufficient because it did not undertake a site-specific analysis despite the fact that "highly erodible soils are found on more than 233,900 acres in the [NKRD]" and "[off road vehicle] use is highly discouraged on over 244,573 acres." (Doc. 45 at 20.) Plaintiffs do not say why additional analysis beyond that which was conducted by the Forest Service is required. Defendants contend that their analysis, conducted on a district-wide scale, was appropriate. (Doc. 49–1 at 33–34.)

The Court agrees with Defendants. Given the fact that "[t]he effects to soils by motorized uses on native surface routes *are directly related to the impact caused by the vehicle footprint* on the ground" (AR 13997), and the fact that the cross-country motorized travel prohibition and MBGR limitations apply across the NKRD, it was not unreasonable for the Forest Service to conduct a district-wide analysis. And, the Court finds that the Forest Service properly considered the impacts on soil by motorized uses in its EA. (AR 13991–14009.) Accordingly, the Court finds that the Forest Service satisfied NEPA's "hard look" requirement with respect to the impact the NKRD's MBGR allowance may have upon soils.

Regarding invasive weed dispersion, Plaintiffs argue that "there is *no analysis* of the impacts of continued use of cross-country travel throughout nearly the entire forest on the spread or management of invasive species other than the statement that the action alternatives 'would reduce the introduction and spread of exotic weeds by hunters.' " (Doc. 45 at 20–21 (emphasis added).) There is simply no support for this statement.

The Forest Service conducted an adequate analysis of the potential effect of the MBGR alternatives on the introduction of new species. (AR 26117–28, 14015–18, 40923–33.) For example, each ranger district's EA discusses the general effects of invasive exotic weeds and the various ways that those weeds may be introduced or spread. (AR 26117–19, 14015–17, 40923–24.) Each ranger district's EA recognizes that motorized vehicle is a common, if not the most common, cause of weed introduction and spread. (AR 26117, 14015, 40923.) Each ranger district's EA also describes the direct and indirect effects on invasive exotic weeds accompanying each alternative. (AR 26117–28; 14017–18; 40926–33.) Based on all of this, the Court finds that the Forest Service did consider the effect of MBGR on the introduction of new species, and their consideration and discussion of the issue meets NEPA's "hard look" requirement.

Regarding tire tracks, Plaintiffs argue that the impacts analysis for each ranger

district fails to consider "any impacts to any resources beyond the direct impact of the tires coming in contact with the ground" such as noise and human access. (Doc. 45 at 21.) For the second time, Plaintiffs present no compelling argument or evidence that the Forest Service's methodology (discussed *supra*) violates the NEPA.

Regarding animal habitat, Plaintiffs argue that the TRD's EA and DN/FONSI did not analyze the impacts on mule deer, elk, pronghorn, or wild turkey associated with MBGR, and dispute the NKRD and WRD's finding that the impacts on mule deer, white-tailed deer, and elk associated with MBGR are "less than" or "reduced" from the no action alternative. (Id. at 21.) Plaintiffs' only support for their argument is the fact that these species' habitats occur within certain areas within the ranger districts. (Id.) Defendants argue the record shows that the Forest Service did discuss the potential impacts on these species, and point to the "Wildlife" subsections in each ranger district's EA. (Doc. 49–1 at 36.) Defendants further argue that these subsections show support for the Forest Service's decision that by prohibiting cross-country motor vehicle use, the quality of these species' habitats would improve. (Id.) The Court agrees.

First, contrary to Plaintiffs' argument, the record shows that the Forest Service did analyze the impacts on mule deer, elk, and pronghorn associated with MBGR on the TRD. (AR 26108–26112.) The Forest Service did not analyze the impacts on wild turkey because only elk, mule deer, and pronghorn were found to have the potential of being affected by implementation of the activities associated with proposed project. (AR 26107.)

Second, the record supports the finding that the impacts on mule deer and elk in the WRD and mule deer in the NKRD would be reduced under a cross-country motor vehicle use prohibition. The EA for the WRD acknowledges that elk are affected by human disturbance associated with motorized travel. (AR 40952.) Under the selected alternative, the open road system would be reduced and motorized cross-country travel restricted, resulting in, predictably, "reduced motorized access to the district for hunters to shoot elk and reduced levels of human disturbance associated with motorized travel" and thus, "increased habitat quality for elk." (AR 40953.) Additionally, MBGR would be restricted to the fall, outside of the spring elk calving season. (Id.) Similarly, the EA acknowledges that mule deer are affected by human disturbance associated with motorized travel. (AR 40954.) The current system allows for "widespread motorized access across the district for hunters to shoot mule deer" but under the selected alternative, 130 of the 420 existing open roads would be closed and MBGR (of elk) would occur during the fall, outside of the spring mule deer fawning season. (Id.) The Forest Service reasonably concluded that the reduced open road system and restrictions on motorized cross-country travel would result in reduced motorized access to the district for mule deer hunters, and reduced levels of human disturbance associated with motorized travel, and ultimately increased habitat quality for mule deer. (Id.)

The EA for the NKRD also supports the Forest Service's conclusion that the impacts on mule deer in the ranger district would be reduced. As discussed *supra*, the previous policy did not limit the type of species which could be retrieved by motor vehicle, did not limit the distance traveled from system roads, and had no restrictions on seasons or weather conditions and no requirement for use of a direct route. (AR 14248.) Under the selected alternative,

however, only legally harvested bison or elk may be retrieved by motorized vehicle; MBGR of legally harvested bison or elk is allowed only during seasons designated by the AZGFD, and for 24 hours following each season; only one vehicle (one trip in and one trip out) is allowed for MBGR per harvested animal; hunters are required to use the most direct and least ground disturbing route in and out of the area to accomplish the retrieval; and MBGR is not allowed in any existing off-road travel restricted area, or when conditions are such that travel would cause negative resource impacts. (AR 14241.) It was not unreasonable for the Forest Service to conclude that these limitations would reduce the impacts on mule deer.

For these reasons, the Court finds that Plaintiffs' argument fails. The Forest Service took the requisite "hard look" at the impact of the travel management plans on wildlife.

Lastly, Plaintiffs argue that "the realities of a lack of compliance by hunters *were not identified or analyzed* in the EA and DN/FONSI." (Doc. 45 at 22 (emphasis added).) According to Plaintiffs, such "realities" include the ability for hunters to drive off-road vehicles to nearly every part of the forest and the unknown number of hunters who have and will participate in MBGR. (Id.) The argument lacks merit. First, the Forest Service reasonably anticipated the number of hunters who will participate in MBGR based upon historical data collected by the AZGFD. (AR 13956, 26026, 40839–40.) Second, as Defendants correctly point out (Doc. 49–1 at 36.), NEPA does not require that the Forest Service address *every* uncertainty. Wild-Earth Guardians v. Montana Snowmobile Ass'n, 790 F.3d 920, 928–29 (9th Cir. 2015). In this case, the Forest Service's discussion of enforcing the travel management plans for each ranger district adequately

addresses the issue of hunter noncompliance. (AR 13977, 26040, 26058, 40857, 40869–70.)

In sum, the Court finds that the Forest Service has provided a convincing statement of reasons as to why the potential effects of MBGR under the Travel Management Plans would have no significant impact with regard to wet conditions, erodible soils, invasive weeds, tire tracks, animal habitat, and hunter noncompliance. Accordingly, the Court finds that the Forest Service has taken the necessary "hard look" under NEPA.

### 2. Effects of Closing Routes

Plaintiffs next argue that Defendants violated the NEPA by failing to disclose and analyze the effects of those routes the Forest Service has not designated, and the effects of those roads closed across the three ranger districts. (Doc. 45 at 23.) The argument is unpersuasive.

Plaintiffs rely on a series of cases, none of which support their argument. Plaintiffs cite Wilderness Soc. v. U.S. Forest Service, 850 F.Supp.2d 1144 (D. Idaho 2012) for the proposition that the Forest Service must take a "hard look" at the impact of those existing routes it is *not* designating. (Id.) Wilderness, however, stands for the proposition that the Forest Service must take a "hard look" at the impact of existing, non-system routes that it *is* designating. Wilderness, 850 F.Supp.2d at 1157–58.

Plaintiffs also cite Sierra Club v. Bosworth, 352 F.Supp.2d 909 (D. Minn. 2005) and Sierra Club v. U.S. Forest Service, 857 F.Supp.2d 1167 (D. Utah 2012), in support of the assertion that the Forest Service should have analyzed the impacts from illegal use of those routes not designated or closed roads. (Doc. 45 at 24.) As Defendants correctly point out, however, Bosworth and Sierra Club are readily dis-

tinguishable from this case. (Doc. 45–1 at 38.)

In Bosworth, the Forest Service constructed temporary and system roads as part of a timber harvest project, and planned to decommission the temporary roads after the harvest. Bosworth, 352 F.Supp.2d at 913–14, 924. The district court found that the EA contained virtually no analysis of any illegal use of the roads post-decommission—despite the small number of enforcement officers in the forest, the "questionable efficacy of road closures through use of berms and gates," and the fact that the Forest Service conceded the occurrence of illegal use. Id. at 924. Based on all of this, the district court found that Forest Service had not provided sufficient analysis to support its statement that the new roads would not result in any cumulative adverse effects. Id. at 924–25. Here, the Forest Service is not constructing new roads and decommissioning those roads at a later time. Therefore, Bosworth is not analogous, and not helpful, to Plaintiffs' case.

Sierra Club is similarly unhelpful. There, the Forest Service assumed that under each Travel Plan alternative, trails that would not be open for motorized use would be closed and rehabilitated, and further assumed that efforts to close the routes would be effective, despite acknowledging that illegal use would continue. Sierra Club, 857 F.Supp.2d at 1174. The district court found that the Forest Service failed to provide support for these assumptions, and therefore found that it had failed to take the requisite "hard look" at the impact of its decision on the use and creation of illegal motorized routes. Id. at 1174–75. Here, the Forest Service has made no such assumptions.

Lacking any legal or factual support for their argument, Plaintiffs' argument fails.

Moreover, the Court agrees with Defendants (Doc. 49–1 at 37) that evaluating the effects of closing roads to motor vehicles but not obliterating them is outside the purpose and need of the travel management projects. See Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998) (explaining that agencies are afforded "considerable discretion" in defining the purpose and need of a project). The purpose of each action was to "improve the management of motorized vehicle use" on the KNF in accordance with the TMR. (AR 13952, 26023, 40835.) The actions were needed to: amend the KNF plan to prohibit motor vehicle use off the designated system of roads, trails, and areas, with some exceptions; reduce adverse resource impacts caused by roads and motorized cross country travel in order to maintain and restore the health of ecosystems and watersheds; and specify the appropriate uses of motor vehicles on the designated road systems. (Id.) Clearly, the focus of the actions is on those routes where motorized vehicle use is allowed, and, an evaluation of routes where motorized vehicle use is not allowed would be only tangentially related to purpose and need for the actions. See Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012). ("We do not require the agency to compile an exhaustive examination of each and every tangential event that potentially could impact the local environment. Such a task is impossible, and never-ending.") (internal quotations and further citation omitted). Accordingly, the Court finds no NEPA violation.

### 3. Effects of Motorized Use

█ Plaintiffs next allege that the EAs are inadequate because they fail to properly consider the cumulative impacts of motorized vehicle use. (Doc. 45 at 25.) As part of its assessment of environmental impacts of an agency action, a proper NEPA analy-

sis must include an analysis of the action's cumulative impact. City of Carmel v. Dep't of Transp., 123 F.3d 1142, 1160 (9th Cir. 1997) (citing 40 C.F.R. § 1502.16). A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions..." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id.

Plaintiffs' argument is confusing, unclear, and thus unhelpful, on this matter. In the end, Court managed to extract two major allegations: (1) the Forest Service's cumulative impacts analysis is deficient with respect to the impacts from illegal motorized vehicle use (Doc. 45 at 25); and (2) the Forest Service's cumulative impacts analysis is deficient because the Forest Service did not incorporate analysis from the effects of the existing travel system (id. at 25–31).

As to the latter allegation, Defendants summarily argue that the cumulative impacts analysis of the effects of the existing travel system is not deficient, and their conclusion of no cumulative impact was reasonable. (Doc. 49–1 at 39–44.) In support, Defendants point to several places in the administrative record where they analyzed the current and ongoing impacts of motorize use on natural resources: the "Existing Conditions" sections (AR 40835; 26023; 13952) of each EA, which outline current activities in the forest, including motorized use, and the impacts of those activities; and the chapters entitled "Environmental Effects" (AR 13972, 26046, 40861), which summarize the existing conditions of forest resources and disclose the potential effects of implementing each alternative. (Doc. 49–1 at 40.)

Defendants also argue that where the Forest Service has proposed a travel designation decision that would result in a *net reduction* of motor vehicle use in a forest, the Forest Service properly incorporates the baseline effects of previous motor vehicle use into its cumulative effects analysis. (Id. (citing cases).) In the end, Defendants argue, "the Forest Service incorporated the combined effects of past motor vehicle use into its baseline, determined that the effect of the proposed decisions would be a net reduction in motor vehicle use, performed a detailed impacts analysis, and concluded that there would be no significant impact" and that under NEPA, this conclusion is sufficient. (Doc. 49–1 at 40.) The Court agrees.

The Forest Service reasonably concluded that no cumulative impact would result from the net reduction of routes available for motorized use in each ranger district. In upholding these conclusions, the Court follows a line of other district courts which have upheld the Forest Service's no cumulative impact conclusion where the proposed action led to net fewer routes available for motorized use. See Central Sierra Environmental Resource Center v. U.S. Forest Service, 916 F.Supp.2d 1078, 1094 (E.D. Cal. 2013); Klamath–Siskiyou Wildlands Center v. Graham, 899 F.Supp.2d 948, 962 (E.D. Cal. 2012); Idaho Conservation League v. Guzman, 766 F.Supp.2d 1056, 1065–66 (D. Idaho 2011).

As to the former allegation, Plaintiffs do not explain how the cumulative impacts analysis is deficient with respect to illegal motorized vehicle use; instead, they rely on a previous argument (Doc. 45 at 25 (citing Doc. 45 at 24)) which the Court already rejected in the previous section.

Thus, the Court finds no NEPA violation on the grounds that Defendants failed to take a "hard look."

**B. Whether the Travel Management Plans Will Have or May Have a Significant Effect on the Environment**

■ Plaintiffs next contend that the Forest Service violated the NEPA by declining to prepare an EIS for each travel management plan "despite the presence of several significance factors indicating possible significant environmental consequences of the proposed actions." (Doc. 45 at 33.)

■ "An EIS must be prepared if substantial questions are raised as to whether a project...may cause significant degradation of some human environmental factor." Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (internal quotations and further citation omitted). "Thus, to prevail on a claim that a federal agency violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur." Id. "It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." Id.

Whether effects are "significant" depends on both "context" and "intensity." 40 C.F.R. § 1508.27. "Context" refers to the "setting" of the proposed action, and "intensity" refers to the "severity of the impact." Id. A project's "intensity" is evaluated based on ten factors:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

§ 1508.27(b). Here, Plaintiffs again contend in a conclusory manner that the NKRD, TRD, and WRD travel management plans implicate a number of these factors. (Doc. 45 at 33–42.)

### 1. Beneficial and Adverse Impacts, Cumulatively Significant Impacts

Plaintiffs refer the Court to other arguments in their memorandum in support of their contention that the proposed actions for each ranger district are significant under § 1508.27(b)(1) and § 1508.27(b)(7). (See Doc. 45 at 33–34.) The Court addresses these arguments and disposes of them elsewhere in this Order, and thus finds that Plaintiffs have failed to raise substantial questions under these factors that would trigger the need for an EIS.

### 2. Unique Characteristics of the Geographic Area

Under § 1508.27(b)(3), the Forest Service must consider the unique characteristics of the project area, such as proximity to park lands and ecologically critical areas. Plaintiffs argue that the Forest Service did not adequately consider the effect of the travel management plans on: (1) the spreading of exotic plants from the TRD and the NKRD to Grand Canyon National Park ("GCNP"); (2) illegal motorized vehicle use in each ranger district, which could affect GCNP (TRD), the Havasupai Indian Reservation (TRD); Red Butte and Coconino Rim areas (TRD), and designated wilderness areas (TRD, WRD, NKRD); and (3) the Mexican spotted owl ("MSO") habitat and its designated critical habitat (WRD and NKRD), and the MSO Protected Activity Centers ("PAC") (WRD). (Doc. 45 at 34–37.) The Forest Service argues that it evaluated each selected alternative's potential impact on the unique characteristics of the KNF, and determined that there would be no significant impacts.

(Doc. 49–1 at 45.) The record supports the Forest Service's conclusion.

*Spreading of Exotic Plants*

In the TRD's EA, the Forest Service analyzed the potential impact of MBGR on the spreading of exotic plants, and concluded that the proposed action will actually reduce the spread of exotic plants. (AR 26123.) The Forest Service acknowledged the possibility that exotic plants might enter the GCNP through the KNF and identified a way by which this possibility might be reduced: by reducing the road density along the boundary between the GCNP and the KNF. (AR 26121.) Effectuating this, the proposed action converts 20% of NFS roads to administrative use (and prohibits most motorized cross-country vehicles except for administrative purposes or by permit), thus reducing the spread of existing noxious and invasive exotic weeds and the introduction of new weeds. (AR 26122–26123.) Although motorized cross country travel by Forest Service employees, contractors, and permittees in support of land management projects would be allowed, the Forest Service cites various best management practices and mitigation measures to minimize the likelihood of exotic plants spreading, such as the requirement that loggers, miners, and utility crews wash their heavy equipment before entering the Forest. (AR 26121.)

Similarly, in the NKRD's EA, the Forest Service analyzed the impact of MBGR on the spreading of noxious and invasive weeds. (AR 14015–17.) The Forest Service acknowledged that "one of the many dispersal mechanisms in which invasive species are spread is via roads and forest visitors." (AR 14015.) Under the proposed action, the number of roads that can be traveled is reduced by 376 miles, thereby lowering the amount of invasive species seed introduced or spread across the NKRD. (AR 14017.) Moreover, under the

proposed action, MBGR where authorized is expected to lead to a "small increase in the potential for invasive species spread and disturbance" since MBGR is limited to the retrieval of certain species, at certain times, and under certain conditions. (AR 14017.) Also, the Forest Service notes that it continuously surveys the NKRD to control and eradicate new infestations before they have the opportunity to spread, which, according to the Forest Service, has proven a successful strategy in "eradicating or reducing potentially serious noxious species threats." (AR 14015.)

Plaintiffs' singular and conclusory statement that exotic plants might spread from the TRD or the NKRD to GCNP does not raise substantial questions that would trigger the need for an EIS. In any event, the Forest Service did consider the unique characteristics of the GCNP in its noxious and invasive weed analyses, and supplied a convincing statement of reasons as to why no significant impact would result.

*Illegal Motorized Vehicle Use*

Plaintiffs argue that the Forest Service did not consider the effect of the travel management plans on the unique characteristics of the ranger districts, in particular, the effect of illegal motorized use. Other than a suggestion from the National Park Service ("NPS") that the Forest Service implement a one-mile buffer zone between the TRD and the GCNP, and Plaintiffs' observation that illegal motorized vehicle use may occur, and does occur, on each ranger district, Plaintiffs offer no real argument, and cite to no facts, to support the argument. (Doc. 45 at 35–36.)

Not only did the Forest Service explain the reason for their decision not to implement a buffer zone (because management actions need to extend to the boundary line) (AR 24100), but it also explained that it would work to limit the effects of illegal

motorized vehicle use by prohibiting cross-country travel, limiting MBGR, and working closely with AZGFD "to monitor and enforce illegal cross-country travel associated within hunting activities." (Id.) And, under the proposed action, prohibiting cross-country motorized vehicle use would serve to "restrict creation of unauthorized routes through the forest and...reduce the negative effects that result from cross country motorized travel" (AR 26064, 26066), and the cumulative effects of illegal motorized vehicle use due to the allowances for MBGR would be "minor and...not likely to impede the attainment of the Forest Plan scenic integrity objectives" (AR 26073–74).

Expounding on their observation that illegal motorized vehicle use may occur and does occur in each ranger district, Plaintiffs present hypothetical illegal motorized vehicle use situations, and point out that each ranger district has experienced impacts from illegal motorized vehicle use despite being "closed" to motorized vehicle use. (Doc. 45 at 36.) Given the extraordinary number of roads over which the Forest Service has jurisdiction across these three ranger districts—3,343 miles of roads in the NKRD (AR 13953), 709 miles of roads in the TRD (AR 26024), and 1,500 miles of roads in the WRD (AR 40836)—it is not surprising that illegal vehicle motorized use occurs even if roads are "closed" to motorized vehicle use. The fact that some illegal motorized vehicle use occurs, without more, proves nothing.

Importantly, each ranger district's EA discusses illegal motorized vehicle use, and the record shows that such effects would not be significant. Under the proposed action for the TRD, motorized cross country travel (which has the "greatest negative effects on scenic quality and integrity") would be prohibited, which led the Forest Service to reasonably conclude that this

would "restrict [the] creation of unauthorized routes through the forest," "reduce the negative effects that result from cross country motorized travel," and "reduce the potential for illegal riding on the non-motorized trail system..." (AR 26063–65.) Notably, the proposed action does not change the current policy prohibiting all motorized travel in the Coconino Rim and Red Butte areas. (AR 26063.)

Similarly, under the proposed action for the WRD, motorized cross country travel would be prohibited, which led the Forest Service to reasonably conclude that there would be a great reduction of "noise, dust and unwanted motorized intrusions." (AR 40880–82.) The prohibition would also result in "negative" effects to motorized recreationists because they would be restricted to designated systems of forest roads, and result in "positive effects" to "vegetation cover, natural settings provided adjacent to the designated road system, improved scenic quality, and greater sense of isolation." (AR 40883.) Also, the limitations on MBGR in the WRD would ensure only short term negative effects on the ranger district. (AR 40882–83.)

Finally, under the proposed action for the NKRD, the quantity of forest roads open to motorized travel would be reduced by 20%, and motorized cross-country travel would be prohibited. (AR 13985.) This prohibition, the Forest Service reasonably concluded, would "restrict creation of unauthorized routes through the forest and would greatly reduce the effects of linear routes and contrast with the surrounding landscape that result from repeated cross-country motorized travel" and over time, improve the district's visual integrity. (Id.) Also, MBGR would result in only short term effects, such as vegetation trampling, but no effects to visual quality. (AR 13986.)

Contrary to Plaintiffs' claim, the administrative record shows that the Forest Service considered illegal motorized use in each district and supports the Forest Service's conclusion that the effects would not be significant. Plaintiffs conveniently overlook the Forest Service's discussion on the issue, and its stated plans to reduce the number of illegal motorized vehicle use incidents and its associated effects. In the end, Plaintiffs fail to raise serious questions regarding illegal motorized use under the travel management plans.

*Mexican Spotted Owl*

Plaintiffs dispute the Forest Service's determination that the travel management plans would have no significant impact on the Mexican spotted owl ("MSO") habitat, MSO critical habitat, and MSO PAC in the WRD and NKRD. (Doc. 45 at 36–37.) Plaintiffs cite to various parts of the administrative record where the Forest Service discusses potential negative impacts on MSO, and to the U.S. Fish and Wildlife Service's (FWS) recommendations and warnings to the Forest Service on the issue. (Id. at 36–37, 40–42.) Plaintiffs argue that "[b]ecause the effects of the [WRD and NKRD] travel management plans 'may effect' Mexican spotted owls and their critical habitat, substantial questions have been raised as to whether or not the two travel management plans will have significant impacts on the owl and its critical habitat, thereby requiring an EIS for each ranger district." (Id. at 40–41.)

Under Plaintiffs' theory, any information in an EA or NEPA documents that admits impacts on the MSO and its habitat would trigger preparation of an EIS. "NEPA permits a federal agency to disclose such impacts without automatically triggering the 'substantial questions' threshold." Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1240 (9th Cir. 2005). Not only have Plaintiffs failed to raise substantial questions on the MSO issue, the Forest Service's analyses support its

determination that the travel management plans would have no significant impact on the MSO.

The WRD's EA recognizes that roads and motorized travel have potential negative direct and indirect effects on wildlife (such as habitat loss, fragmentation, the potential for animals to be killed or injured as a result of being hit or run over by motor vehicles, and human disturbance or harassment of animals facilitated by motorized travel). (AR 40933.) The proposed action, however, would result in an increase in the MSO's habitat quality and would have "primarily beneficial" effects. (AR 40937.) Supporting this conclusion are the following facts: the closure of 1 mile of the 1.8 miles of currently open roads intersecting PACs on the WRD; a 62–mile decrease in the WRD designated road system; and a substantial restriction of motorized cross-country travel. (AR 40936–37.) The restriction of motorized cross-country travel is "substantial" because it would prohibit all motorized cross-country travel except for MBGR of elk. (AR 40934.) Currently, most motorized cross-country travel occurring on the WRD is for purposes other than big game retrieval. (Id.) And, under the proposed action, motorized big game retrievals "would be dispersed spatially across the district" and occur between September and December—outside the spring and summer breeding/nesting season. (AR 40934.) The Biological Assessment and the Wildlife Report and Biological Evaluation support these conclusions. (AR 40528–40532, 40746–40750.)

Importantly, the FWS concurred with the Forest Service that the WRD's proposed action would affect, but was not likely to adversely affect, the MSO in the WRD, specifically finding that the proposed action would not alter key habitat components of MSO habitat or primary constituent elements of MSO critical habitat. (AR 40798–99.) The FWS also found that "[r]eductions of cross-country motorized travel and what will be the designated road system should decrease the current effects of motorized vehicle traffic to MSO and their critical habitat." (AR 40798–99.)

Similarly, the EA for the NKRD recognizes that "[m]any of the direct and indirect effects of roads on wildlife are negative" but that "there is an opportunity to reduce impacts to wildlife by restricting cross-country travel and reducing the density of open roads on the district"—opportunities the proposed action seizes. (AR 14018.) The proposed action reduces the designated road system by 20% and prohibits cross-country travel (with the exception of authorized motorized travel for camping and retrieval of big game), resulting in "fewer impacts to habitat of spotted owl small mammal prey" and "some level of increased quality of spotted owl foraging habitat within designated Critical Habitat." (AR 14022.) The Biological Evaluation and Wildlife Report support these conclusions. (AR 13689–90; 13804–05.) The restrictions placed upon MBGR limit the impact on MSO by allowing MBGR of elk and bison only, and limiting the distance traveled, number of trips, and seasons for retrieving. (AR 14020.) While the concentration in camping corridors "may increase disturbance to MSO habitat," the potential for disturbance will be decreased because only 1.7 miles of roads will be used for corridor camping, and the roads are located in open, grassy areas. (AR 14022.)

For these reasons, the Court finds that Plaintiffs fail to raise substantial questions on the MSO issue, and the record supports the Forest Service's determination that the travel management plans will have no significant impact on the MSO.

### 3. Highly Controversial

The Forest Service must consider "[t]he degree to which the effects . . . are likely to be highly controversial." § 1508.27(b)(4). A controversy exists where there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." Blue Mountains, 161 F.3d at 1212 (quoting Greenpeace Action v. Franklin, 14 F.3d 1324, 1335 (9th Cir. 1992)).

Plaintiffs argue that a "significant controversy exists as to the amount and type of motorized recreation that would be allowed across the three ranger districts" because "thousands" of comments were submitted during the NEPA process, "many of them protesting the Forest Service['s] proposed action and excessive allowance of motorized big game retrieval." (Doc. 45 at 38.) Based on the sheer number of comments submitted, Plaintiffs urge the Court to find that a controversy exists: "[i]f approximately 385 negative comments on a federal action are sufficient to demonstrate a controversy such that an EIS is required . . . surely the significantly greater volume of negative comment here also demonstrates the controversial nature of the [ranger districts] . . ." (Id., citing National Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722 (9th Cir. 2001).) The Forest Service argues that none of the comments case serious doubt upon the reasonableness of the Forest Service's conclusions, and that Plaintiffs offer no facts contradicting the Forest Service's conclusions that no substantiated controversy exists.

The Court rejects Plaintiffs' argument. As stated *supra*, a proposal is highly controversial where there is "a substantial dispute [about] the size, nature, or effect of the major Federal action *rather than the existence of opposition to a use*." Blue Mountains, 161 F.3d at 1212 (9th Cir. 1998)

(quoting Greenpeace, 14 F.3d at 1335) (emphasis added). Plaintiffs do not argue that the proposed actions are highly controversial because there is a substantial dispute about the size, nature, or effect of the actions; they argue that the proposed actions are highly controversial because there is opposition, as evidenced by the number of comments submitted. Indeed, Plaintiffs rely heavily on Babbitt, 241 F.3d 722 (9th Cir. 2001) abrogated by Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010), but the case only undermines their argument. In Babbitt, the Court stated that "*[m]ore important*" than the number of negative comments received was the fact that the comments "cast[ed] substantial doubt on the adequacy of the Park Service's methodology and data." Babbitt, 241 F.3d at 736 (emphasis added). Plaintiffs here fail to explain how the comments cast substantial doubt on the adequacy of the Forest Service's methodology and data.

Accordingly, the Court finds that the number of comments received by the Forest Service, without more, does not raise substantial questions that would trigger the need for an EIS.

### 4. Highly Uncertain or Unique or Unknown Risks

The Forest Service must also consider "[t]he degree to which the possible effects . . . are highly uncertain or involve unique or unknown risks." § 1508.27(b)(5). An EIS is not required anytime there is *some* uncertainty, but only if the effects of the project are *highly* uncertain. Environmental Prot. Info. Ctr. v. United States Forest Serv., 451 F.3d 1005, 1011 (9th Cir. 2006) (further citation omitted) (emphasis added).

Plaintiffs argue that uncertainty and unknown risks exist because there is "simply no way for the Forest Service to know

exactly where effects [of MBGR] will be realized and what those effects will look like" because "it is unknown how many hunters will kill a big game animal, where on each forest those animals will be killed, what type of vehicle they will use to retrieve the carcass, whether any noxious weeds are present in the area that may be spread, and what route those hunters will take to reach the carcass." (Doc. 45 at 38–39.)

The Forest Service contends that NEPA regulations do not require a reviewing agency to eliminate "all uncertainty" prior to issuing a FONSI, and further contends that there is very little uncertainty as to the potential effects of the proposed decisions. (Doc. 49–1 at 49). The Forest Service points to the fact that cross-country travel motor vehicle use would be prohibited under the proposed actions—a significant departure from previous policies, under which unrestricted cross-country vehicle use for any purpose was allowed. (Id.)

Plaintiffs' argument lacks merit. Contrary to what Plaintiffs assert, the Forest Service has an estimated number of big game animals that will be killed and then retrieved by motorized vehicle an annual basis, and knows the general areas and locations where these animals are killed, because the AZGFD tracks this information on an annual basis. (AR 13956, 26026, 40889–40.) Additionally, the Forest Service analyzed the spread of noxious weeds and implemented measures to reduce the chances of such spreading occurring ((see supra). Based on the foregoing, the Court finds that Plaintiffs have failed to show that the projects' effects are highly uncertain. The Court further finds that the record supports the Forest Service's determination that the proposed decisions would result in only some uncertainty.

### 5. Precedent for Future Actions

Under § 1508.27(b)(6), the Forest Service must consider "the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." Plaintiffs argue that the proposed actions, in particular MBGR under the proposed actions, create precedent because "other National Forests intend to adopt decisions" mirroring the KNF. (Doc. 45 at 40.) In support, Plaintiffs cite a statement by a Prescott National Forest ("PNF") spokeswoman ("We'll try to match [the Kaibab National Forest] as best as we can") and an alleged statement from Coconino National Forest ("CNF") NEPA documents ("the CNF will defer to the neighboring Kaibab National Forest's policy for MBGR in units shared with the Williams Ranger District, regardless of how the Coconino proposes to apply the Travel Management Rule for MBGR."). (Id., citing AR 26303, 26326.)

These statements prove nothing. The PNF spokeswoman simply said that the PNF will *try* to match the KNF, and the alleged statement from the CNF's NEPA documents strongly suggests that the CNF will apply the TMR for MBGR *differently* in its Forest. Therefore, the Court finds Plaintiffs have failed to raise serious questions regarding the precedential effect of the Forest Service's decisions in the KNF as to trigger the need for an EIS.

### 6. Cultural or Historical Resources

Under § 1508.27(b)(8), the Forest Service must consider "the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant . . . cultural[ ] or historical resources." Plaintiffs argue that the travel management plans

"contemplate significant adverse impacts to sites listed in or eligible for listing in the National Register of Historic Places or the loss or destruction of significant cultural resources" and direct the Court to their NHPA argument. (Doc. 45 at 40.) As discussed *infra*, however, the travel management plans did not violate the NHPA and therefore did not adversely affect, or cause the loss or destruction of, significant cultural or historical resources.

### · 7. Threatened Species or Its Habitat

Under § 1508.27(b)(9), the Forest Service must consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat..." Plaintiffs contend that the travel management plans' effects are likely to adversely affect the MSO and its habitat. (Doc. 45 at 40–42.) For reasons already discussed in this Order, however, the Court finds that record supports the Forest Service's determination that the travel management plans will have no significant impact on the MSO or its habitat.

### 8. Violation of Federal Law

Under § 1508.27(b)(10), the Forest Service must consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." Plaintiffs argue that the travel management plans for each ranger district "contemplate violations of the travel management rule, Executive Order 11644, and the National Historic Preservation Act." (Doc. 45 at 42.) As discussed *supra* and *infra*, however, the travel management plans did not violate the TMR or the NHPA and therefore did not threaten a violation of federal law.

"If substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." Save the Yaak, 840 F.2d at 717 (further citation omitted). Plaintiffs have failed to raise substantial questions under any of the factors that inform Court's inquiry. Moreover, Defendants have supplied convincing reasons why certain effects would not be significant. Accordingly, the Court finds no NEPA violation as alleged by Plaintiffs.

Having found no NEPA violation on any basis asserted by Plaintiffs, the Court will grant summary judgment in favor of Defendants on the NEPA claim.

## NATIONAL HISTORIC PRESERVATION ACT

### A. Threshold Matter—Standing ·

Defendants argue that Plaintiffs lack standing to bring their NHPA claim. (Doc. 49–1 at 18–20.) Specifically, Defendants argue that Plaintiffs do not satisfy the first element of the Article III standing test: injury in fact. (Doc. 49–1 at 18, Doc. 72 at 9.)

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotations and further citation omitted).

As to the first element, Plaintiffs assert that they have suffered a procedural injury in fact. (Doc. 65 at 2.) In support, Plaintiffs submitted the Declarations of Joseph Shannon on behalf of the Sierra Club, Kim Crumbo on behalf of Grand Canyon Wild-

lands Council, and Andrew Laurenzi on behalf of WildEarth Guardians. (Docs. 47–48, 69.) Plaintiffs also submitted a supplemental declaration of Crumbo. (Doc. 68.)

 To show a cognizable procedural injury in fact, a plaintiff must allege "that (1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." O'Neill, 386 F.3d at 1197 (further citation omitted). A "concrete" interest includes an aesthetic or recreational interest. Id.

 Here, Plaintiffs allege concrete aesthetic interests in the enjoyment of the Kaibab National Forest. For example, in Kim Crumbo's supplemental Declaration, he states that he explores, by hiking or four-wheel driving, the ranger districts for both recreational and professional purposes. (Doc. 68 at ¶¶ 8–10.) In Andrew Laurenzi's Declaration, he states the he regularly visits all three ranger districts to hike and to observe wildlife, biological features, archaeological, and culturally significant sites. (Doc. 69 at ¶ 4.) In Joseph Shannon's Declaration, he states that he is avid recreationist in the WRD. (Doc. 48 at ¶¶ 1–2, 8–11.) Plaintiffs also point to Section 106 of the NHPA (54 U.S.C. § 306108), which requires the Government to "take into account the effect of [an] undertaking on any historic property," and to "afford the Council [on Historic Preservation] a reasonable opportunity to comment regard to the undertaking," and allege that the Forest Service did not satisfy these requirements. (Doc. 1 at ¶¶ 207–08.) It is reasonably probable that the Forest Service's alleged failure to satisfy these requirements threatens Plaintiffs concrete

interests since the requirements are designed to protect historic property,[3] and Plaintiffs regularly venture onto the ranger districts in part to enjoy the historic property of each ranger district. (See Doc. 68 at ¶¶ 25–27, Doc. 69 at ¶¶ 9, 12.) Accordingly, Plaintiffs satisfy the first element of Article III standing. See Friends of the Earth, 528 U.S. at 183, 120 S.Ct. 693 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.") (internal quotations and further citation omitted).

 "A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressability." Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1226 (9th Cir. 2008). Indeed, "[p]laintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." Id. (internal quotations and further citation omitted).). Although Defendants do not challenge the second and third elements of the Article III standing test, the Court concludes that the harm of which Plaintiffs complain is fairly traceable to the Forest Service's conduct, and further concludes that the relief requested—that the Court order the Forest Service to follow certain NHPA procedures (Doc. 65 at 5)—could remedy the harm. See Pit River Tribe v. U.S. Forest Service, 469 F.3d 768, 779 (9th Cir. 2006) ("The procedural injury would be redressed if the [agencies] followed proper procedures.") (quoting Beeman v. TDI Managed Care Servs., Inc., 449 F.3d

---

**3.** "The fundamental purpose of the NHPA is to ensure the preservation of historical resources." Te–Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior, 608 F.3d 592, 609 (9th Cir. 2010) (citing 16 U.S.C. § 470a(d)(1)(A)).

1035, 1040 (9th Cir.2006)). Accordingly, Plaintiffs have satisfied the second and third elements of Article III standing, and have standing to bring their NHPA claim.

## B. Alleged Violations of the NHPA

Under the NHPA, it is the policy of the federal government to "foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations" and to "administer federally owned, administered, or controlled historic property in a spirit of stewardship for the inspiration and benefit of present and future generations." 54 U.S.C. § 300101(1),(3) (2012).[4] Under the NHPA, "historic property" means

any prehistoric or historic district, site, building, structure, or object included in or eligible for inclusion in, the National Register of History Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

Section 106[5] of the NHPA requires federal agencies to "take into account the effect of [an] undertaking on any historic property. § 306108.[6] The federal agency must also afford the Federal Advisory Council on Historic Preservation ("Advisory Council")[7] "a reasonable opportunity to comment with regard to the undertaking. Id. Similar to NEPA, "[s]ection 106 of

NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs." Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 805 (9th Cir. 1999). In its entirety, the section 106 review process requires an agency to

make a reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register ...; assess the effects of the undertaking on any eligible historic properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effects. The [agency] must confer with the State Historic Preservation Officer ("SHPO") and seek the approval of the Advisory Council on Historic Preservation ("Council").

Te–Moak Tribe, 608 F.3d at 607 (further citation omitted).

The Advisory Council and the federal agency "may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" on historic property. 36 C.F.R. § 800.14(b). Programmatic agreements are appropriate under certain circumstances, such as when effects on historic properties are similar and repetitive or are multi-State or regional in scope, or when effects on historic properties cannot be fully determined prior to approval of an undertaking. § 800.14 (b)(1)(i),(ii). Significantly, "[c]ompliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual under-

---

**4.** Formerly cited as 16 U.S.C. § 470–1.

**5.** "Section 106" refers to 16 U.S.C. § 470f, now cited as 54 U.S.C. § 306108.

**6.** Formerly cited as 16 U.S.C. § 470f.

**7.** The Advisory Council promulgates the regulations necessary to implement section 106. See 54 U.S.C. § 304108(a).

takings of the program covered by the agreement...." § 800.14(b)(2)(iii). When the Advisory Council signs a programmatic agreement, "that clos[es] the record for purposes of NHPA § 106." Snoqualmie Indian Tribe v. F.E.R.C., 545 F.3d 1207, 1216 (9th Cir. 2008) (citing § 800.14(b)(2)(iii)).

Plaintiffs advance two NHPA arguments. First, they argue that the Forest Service's reliance on Exemption Q of their Programmatic Agreement for the WRD and TRD was improper, and second, they argue that the Forest Service's "no effect" MBGR determination for the NKRD was improper. (Doc. 45 at 44.) The Court will address each argument in turn.

### 1. Reliance on Exemption Q

The Region 3 First Amended Programmatic Agreement ("PA") exempts a number of Forest Service activities "from further review and consultation" where the Forest Service and the State Historic Preservation Officers (SHPOs) of Arizona, New Mexico, Oklahoma, and Texas have agreed that the activities "have predictable effects and a very low likelihood of affecting historic properties." (S00249–50.)[8] Among the activities exempted under the PA are those "not involving ground or surface disturbance (e.g. timber stand improvement and precommercial thinning by hand")." (S00250.) This exemption is known as Exemption Q. (Id.)

Plaintiffs dispute Defendants' decision to exempt MBGR "from further review and consultation" under Exemption Q. (Doc. 45 at 42–46.) Plaintiffs argue that MBGR is an activity that involves ground and surface disturbance, and the Forest Service even admits this in its TRD and WRD EAs. (Id. at 45–46.) Since Exemption Q only exempts those activities not involving

ground or surface disturbance, the Forest Service's decision to exempt MBGR was arbitrary and capricious. (Id. at 46.) In response, Defendants contend that the Forest Service analyzed the expected surface impacts from MBGR as proposed, and concluded that the likely ground disturbance from MBGR across the ranger districts "was so minimal that it would not adversely affect cultural resources." (Doc. 49–1 at 53.) Defendants also point out that the Arizona SHPO concurred with its findings regarding cultural resource surveys and effects. (Id.)

 The record supports the Forest Service's findings that MBGR under the proposed actions would result in only minimal surface impacts and have a very low likelihood of affecting cultural resources. The findings satisfy the definition of "Exemption" ("those undertakings, which because of their nature and scope, have predictable effects and a very low likelihood of affecting historic properties ..."). (S00253.)

In the TRD, archaeologists evaluated all of the proposed alternatives in relationship to the protocols under the PA. (AR 26159.) Recognizing that potential effects from MBGR may "lead to undesirable effects on cultural resources," archaeologists evaluated the effects in depth. (Id.) Ultimately, they decided that no adverse effects on cultural resources in the TRD were expected due to the fact that only an estimated 414 motorized big game harvests will potentially impact approximately 200 acres per year (or 0.06% of the TRD) and the fact that hunters may only travel off road when conditions are suitable. (AR 26160.)

Similarly, in the WRD, archaeologists evaluated all of the proposed alternatives

---

**8.** The Programmatic Agreement defines "exemption" as "those undertakings, which because of their nature and scope, have pre-

dictable effects and a very low likelihood of affecting historic properties ..." (S00253.)

in relationship to the protocols under the PA. (AR 40961.) And, as they did in the TRD analysis, they acknowledged that potential effects from MBGR may "lead to undesirable effects on cultural resources," and therefore evaluated the effects in depth. (40961–62.) In the end, they found that no adverse effects on cultural resources in the WRD are expected due to the fact that there are only an estimated 695 motorized big game harvests potentially impacting approximately 350 acres per year (or 0.0625% of the WRD) and the fact that hunters may only travel off road when conditions are suitable. (AR 40962–63.)

Based on the archaeologists' findings, it was not unreasonable for the Forest Service to conclude that MBGR on the TRD and WRD would have minimal surface impacts and a very low likelihood of affecting cultural resources.[9] See O'Neill, 386 F.3d at 1206 ("When a court reviews agency action involving primarily issues of fact, and where analysis of the relevant documents requires a high level of expertise, [the reviewing court] must defer to the informed discretion of the responsible federal agencies.") (quoting Sierra Club v. U.S. EPA, 346 F.3d 955, 961 (9th Cir. 2003). Therefore, the Court finds that the Forest Service's decision to exempt MBGR under Exemption Q was not arbitrary or capricious.

### 2. No Effect Determination

Plaintiff final argument is as follows: "[a]lthough the North Kaibab Ranger District does not assert that NHPA compliance is not required under Programmatic Agreement Exemption Q, its no adverse effect from motorized big game retrieval, AR 14832–33, is also arbitrary and capricious for the same reasons as the no adverse effect determinations for the Williams and Tusayan Ranger Districts."

(Doc. 45 at 46.) This singular, conclusory statement constitutes Plaintiffs' entire argument on this issue. Plaintiffs rely on previous arguments challenging the Forest Service's conclusion that MBGR would have insignificant impacts on the ranger districts. Having already rejected these arguments, however, the Court need not address them again.

In the end, the Court finds no NHPA violation on the grounds asserted by Plaintiffs. The Forest Service's reliance on Exemption Q was not improper. Accordingly, the Court will grant summary judgment in favor of the Forest Service on the NHPA claim.

## IV. CONCLUSION

Based on the foregoing,

IT IS HEREBY ORDERED denying Plaintiffs' motion for summary judgment. (Doc. 44.)

IT IS FURTHER ORDERED granting Defendants' cross-motion for summary judgment. (Doc. 49.) The Clerk of Court shall enter judgment in favor of Defendants and terminate this case.

IT IS FURTHER ORDERED denying as moot Intervenor–Defendant Safari Club International's cross-motion for summary judgment (Doc. 52) and Intervenor–Defendant State of Arizona's cross-motion for partial-summary judgment (Doc. 55).

---

9. See also MBGR impacts analyses, *supra* pages 11–15, 17–19, 28–29, 35–36.